IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 21, 2012

## MARIO PENDERGRASS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 93-C-1345      Seth Norman, Judge**

**No. M2011-00126-CCA-R3-PC - Filed August 17, 2012**

In a bench trial, petitioner, Mario Pendergrass, was convicted of two counts of first degree murder, especially aggravated kidnapping, and especially aggravated robbery. The trial court sentenced him to an effective sentence of life in prison plus forty-four years. Petitioner filed a petition for post-conviction relief raising the following issues: (1) whether trial counsel was ineffective for failing to develop mental health evidence; (2) whether trial counsel denied petitioner his right to testify at trial; and (3) whether petitioner voluntarily waived his right to a trial by jury. The post-conviction court denied relief following a full evidentiary hearing. Finding no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Paula Ogle Blair,  Nashville, Tennessee, for the appellant, Mario Pendergrass.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

In the direct appeal, this court summarized the following facts established at trial:

In April of 1993, Donald Crockett, Sr., a former professional wrestler who used the name "Pretty Boy Michael Rose," was employed as a taxi driver

in Nashville. On the evening of April 19, someone called and requested a taxi, but instructed the dispatcher not to send number 15, the cab driven by Crockett. Initially, Crockett suspected that the caller was a previous passenger who owed him money. Moments later, however, the same person called back and said, "Don't send Mike Rose." Crockett, curious about the identity of the caller, drove to the dispatch point at a Krystal restaurant at the corner of Dickerson and Trinity Lane. When he arrived, he observed two men at a telephone booth, one of whom he recognized as Lorenzo Ensley, and the other of whom he identified at trial as the defendant.[1] Crockett described the defendant, whom he did not know, as having a shaved head with "a little bitty ball on the back." He testified that when he asked Ensley why they did not want to ride in his cab, Ensley responded, "Well, I didn't want to get you in no more trouble." Crockett, who explained that he interpreted the comment to mean that illegal drugs were involved, then called the dispatcher and requested another cab. The victim, Robert Glen Pruitt, was dispatched in his taxi. He arrived at the Krystal at approximately 10:30 p.m.

Later that evening, a security device in the victim's taxi alerted the other cab drivers of trouble. When activated, the security device shut down all radio communications other than those from the distressed driver. Crockett overheard a reference to Stevens Lane and Clarksville Highway and drove to that location. Neither the victim nor his cab was there at the time of his arrival. Crockett then drove to a "drug house" on Douglas and inquired as to the whereabouts of Ensley. When he learned that Ensley had been staying at the Colony Motel, Crockett drove to the motel. Police officers were already on the scene and instructed Crockett to leave after he confronted Ensley. The victim's cab was located the following morning near Ewing Lane. Later, the victim's body was found in a field at Brick Church Lane.

Crockett acknowledged that he had never seen the defendant prior to the night in question and had not overheard any conversations between Ensley and the defendant while at the Krystal restaurant. He maintained that he warned Ensley not to hurt any of his fellow cab drivers because Ensley appeared to be "high." While conceding that he was not "one hundred percent certain" at the time of his initial identification of the defendant, he testified, "If there's a God in heaven, that's the man."

---

[1] Petitioner is referred to as "defendant" in the direct appeal opinion.

Bernadette Mitchell often rode in the victim's cab when she could not get a ride home from work. On the evening of the victim's abduction between 10:30 and 11:00 p.m., Ms. Mitchell was at the Krystal on the corner of Dickerson and Trinity with a friend when the defendant and another man approached their car and asked for a ride. She recalled that the defendant did all of the talking and that the other individual stood in the background. When Ms. Mitchell explained that she would not provide the transportation because she did not know them, the defendant replied, "I am Mario Pendergrass. Now you know my name." At that point, the victim arrived in his taxi and, upon seeing Ms. Mitchell, joked that because she worked at a Taco Bell, she should not eat at a Krystal. The defendant and his companion then got into the cab and left. After seeing news of the murder on the next day's 5:30 a.m. broadcast, Ms. Mitchell called the police and told them of her encounter with the defendant and the victim.

Detective Clinton Vogel of the Metro Police Department's murder squad investigated the crime. During the early morning hours of April 20, the victim's taxi was found off of Ewing Lane on a dead-end street hidden behind a closed business. After speaking with Donald Crockett, Detective Vogel went to the Colony Motel to talk to Lorenzo Ensley. The detective testified that Crockett arrived later and identified Ensley. Although the defendant was in the same hotel room as Ensley, Detective Vogel did not speak directly with him at that time. There were other occupants in Ensley's motel room. When asked about their activities the night before, one of the occupants stated that they had been watching television in the motel room. The defendant made no response.

Detective Vogel testified that the body of the victim had a gaping wound to the left side of his head. The location of the blood indicated that the victim had been shot in the field where the body was found. The detective also described a series of lacerations that he observed on the victim's left index finger. The victim's pockets appeared to have been turned inside out and no money was found on the body. Later, his wallet was found among his personal belongings. The following day, Detective Vogel returned to the Colony Motel. The defendant, Ensley, and a few other individuals were there. Ensley directed Detective Vogel and Detective Ed Moran to two vacant lots in Parkwood subdivision where they recovered a sawed-off single-shot 12 gauge shotgun. A single spent shell was in the barrel of the gun.

Detective Vogel acknowledged that Crockett had initially told police that he left the Krystal restaurant before the victim arrived. He also admitted

that of the four men in the room at the Colony Motel, one of whom was the defendant, Crockett could initially identify only Ensley.

Tellas Ensley testified that in April of 1993, he lived at the Colony Motel with his two younger brothers, Lorenzo and Timothy Ensley, and the defendant. He stated that he used to sell drugs on Dickerson Road and that he became acquainted with the victim by riding in his cab. According to Tellas Ensley, he learned of the victim's disappearance when Crockett came to the motel and asked if he had heard anything. He testified that the defendant and Lorenzo Ensley returned to the motel between 9:45 and 11:30 p.m. that evening. Later, while they were watching a movie, a special news bulletin announced that a taxi driver had been killed. In response to the news report, Lorenzo Ensley remarked, "It wasn't worth it." The defendant replied that if he was "going down," Lorenzo Ensley was going with him. According to Tellas Ensley, the defendant then explained that he killed the victim because he did not have enough money for the cab fare, which was $12 to $13. The defendant then admitted that he had removed the victim from the cab and shot him in the head. After making the remarks, the defendant left the room for three to five minutes and then came back with a shotgun and a pistol. Ensley recalled that the defendant then threatened to kill everyone in the room if anything was said about the crime. Later, when the police had left the motel, both the defendant and Lorenzo Ensley asked Tellas Ensley to inform police that they had been in the room at the time of the murder.

Don Carman, a TBI agent specializing in forensic firearm identification, described the shotgun recovered by police as functional and capable of firing 12-gauge shells. He was unable to determine whether the shell recovered by police was fired by the shotgun. Because the weapon had been left outside, the likelihood of positive identification was lessened. Agent Carman stated, however, that both the shell and the wadding discovered next to the body were consistent with the type of ammunition used by the weapon.

James Robert Goodman, an officer with the identification section of the Metro Police Department, investigated the murder scene. While he was photographing the area, he found shotgun wadding "right next" to the victim. Officer Goodman testified that he also found human tissue in the area surrounding the body. In his opinion, the victim had been killed where police found the body.

-4-

Steve Stone, who is also an officer with the Metro Police Department identification section, testified that he investigated the area where the victim's taxi cab was located. He stated that the cab was towed to a secure garage where it was processed inside and out for fingerprints. According to Stone, latent prints of the defendant were on the driver's side trunk deck (fingerprints) and the driver's side rear quarter panel (a partial palm print).

James Patterson, an acquaintance of the defendant who was living in the Colony Motel at the time of the murder, recalled that he was "sitting around getting high" with Tim and Lamont Ensley when Lorenzo Ensley and the defendant arrived. Patterson testified that when Lorenzo made a joking remark to his brother Tim about killing someone, the defendant responded by striking the television and instructing Lorenzo that he "need[ed] to stop bullshitting." According to Patterson, the defendant then told Lorenzo that if he was "going down," Lorenzo was going with him. Later, the defendant warned Patterson, "Don't let nothing we talked about leave the room ."

Patterson acknowledged that he had omitted important facts when interviewed by investigators for the state and the defense. He admitted that he had used cocaine "off and on" for approximately fifteen years and acknowledged that he had spent the day of the murder smoking marijuana, drinking beer, and using cocaine. Patterson estimated that he used cocaine approximately ten times that day and admitted that he engaged in such use two to three times per week. He testified that he may have used cocaine before testifying for the state. Patterson denied having used cocaine the morning of his cross-examination by the defense but conceded that he may have been "high" the preceding evening. He denied buying drugs from the Ensleys and maintained that he merely shared drugs with them.

Larry Flair of the Metro Police Department, the lead detective assigned to the murder, learned at 2:00 a.m. following the murder that the defendant's fingerprints were on the victim's cab. At approximately 7:00 a.m., he and two other detectives questioned the defendant at the Colony Motel. The defendant claimed that "he had been there all night and didn't know anything about it." Afterward, the defendant was arrested and advised of his *Miranda* rights. Upon his arrival at the Criminal Justice Center, the defendant was advised of his rights a second time. Detective Flair testified that the defendant then waived his rights and admitted his involvement in the abduction of the victim. Detective Flair recalled that the defendant claimed that he and Lorenzo Ensley went several places in the victim's cab and that Ensley left the cab, returned

with a shotgun, and said, "Just don't say anything." The defendant stated that Ensley robbed the victim, forced him into the trunk, drove to a remote location, and shot him. At trial, Detective Flair testified that he did not record the interview and that the defendant agreed to repeat the interview on videotape. After moving to the interview room and going over the *Miranda* form, however, the defendant asked to speak with an attorney. The detective ceased the interview.

Detective Terry McElroy investigated the scene where the body was discovered. He found no money in the victim's possession. Later on the morning following the murder, Detective McElroy accompanied Detective Flair to the Colony Motel. He recalled that the defendant initially denied any knowledge of or involvement in the murder. Detective McElroy, who confirmed that the defendant was advised of his Miranda rights first at the motel and later at the Criminal Justice Center, asserted that the defendant provided details of the crime. According to McElroy, the defendant maintained that after he and Lorenzo Ensley got into the victim's cab, they went to the residence of Ensley's relative, where Ensley obtained a sawed-off shotgun. The defendant acknowledged that they drew the weapon and forced the victim into the trunk of the cab. The defendant stated that after driving around for a while, they stopped along Brick Church Lane and removed the victim from the trunk. According to the defendant, Ensley then walked the victim into a field and shot him; upon his return, Ensley handed the weapon to the defendant and instructed him to remove the shell casing. The defendant claimed that he was unable to do so and they decided to dispose of the weapon with the shell casing. He stated that they then abandoned the cab and returned to the motel. Detective McElroy acknowledged that the defendant's statement was not recorded and testified that the defendant initially agreed to repeat his statement on videotape, but changed his mind and requested counsel after being advised of his *Miranda* rights a third time. Detective McElroy testified that after the interview ended he overheard the defendant acknowledge to his mother that he was present when the victim was killed. He also overheard the defendant and his mother discussing the disposal of the weapon.

Three days after the murder, Detective McElroy learned through another officer that the defendant wanted to speak with him. One and one-half hours later, a Davidson County Sheriff's Deputy paged Detective McElroy a second time at the request of the defendant. When he returned from Rutherford County that evening, Detective McElroy met with the defendant at the jail. The defendant signed a specially prepared form acknowledging that he had had no

contact with the detective since the initial interview and that the second meeting was made of his own free will and not the result of any threat or promise. After receiving *Miranda* warnings, the defendant executed a written waiver and made a recorded statement. The defendant stated that on the evening of the murder, he was at the Colony Motel with Lorenzo Ensley and others when they were told to "vacate the premises [be]cause there were too many people." After unsuccessfully attempting to make contact with Lorenzo Ensley's brother, he and Ensley walked to a nearby Amoco station to use a pay telephone. The defendant claimed that he called his mother and that Ensley used a second pay telephone to call for a cab. At that point, the defendant informed Ensley that he did not have money for a cab and agreed to Ensley's suggestion that they accept the ride and escape without paying. The defendant claimed that when the cab arrived, Ensley and the driver acted as though they knew one another. The cab left and when the defendant asked why, Ensley replied that he knew the cab driver. Later, the defendant saw the same cab driver at the Krystal and heard the cab driver warn Ensley, "[J]ust don't kill my friend." The defendant told Detective McElroy that the first cab driver then left and, later, the victim arrived.

The defendant also informed Detective McElroy that he and Ensley initially went to the home of Ensley's aunt. When they left, the defendant noticed a gun slide out of Ensley's sleeve. The defendant stated that he inquired about the weapon and Ensley instructed him to be quiet. The defendant claimed that when Ensley held the gun to the victim's head, he begged Ensley to let the victim go. The defendant contended that Ensley ordered the victim to stop the cab and, after assuring the defendant that "everything[ ][was] cool," put the victim in the trunk. The defendant asserted that he continued to beg Ensley not to kill the victim and that Ensley assured him that he would not. He stated that Ensley eventually stopped the cab in a dark area, got the victim out of the trunk, and pointed the gun at him. The defendant told Detective McElroy that he heard a gunshot and then saw the victim lying on the ground with gravel on his face. He said that Ensley returned to the cab and instructed him to wipe his fingerprints "off of everything." According to the defendant, Ensley told him to remove the spent shell from the shotgun. When he was unable to do so, Ensley stopped the cab and directed him to get out and hide the gun. Ensley then drove to a remote location and abandoned the car. The defendant maintained that he had seen Ensley with the gun several days before the shooting. He also implicated Ensley in the robberies of a local convenience store and motel, as well as in the homicide of another taxi driver.

-7-

*State v. Mario Pendergrass*, No. M1999-02532-CCA-R3-CD, 2002 WL 517133, at \*1-5 (Tenn. Crim. App. April 5, 2002), *perm. app. denied* (Tenn. Oct. 7, 2002).

## II. Procedural History

After a bench trial, petitioner was convicted of premeditated murder, felony murder, especially aggravated kidnapping, and especially aggravated robbery. The trial court merged the murder convictions and imposed a life sentence for murder and twenty-two years each for especially aggravated kidnapping and especially aggravated robbery. The sentences for especially aggravated kidnapping and especially aggravated robbery were consecutive to each other and consecutive to the life sentence for an effective sentence of life plus forty-four years. On direct appeal, this court affirmed the convictions and sentences. *Id.*

Petitioner filed a pro se petition for post-conviction relief on April 16, 2003. The trial court summarily dismissed the petition. On appeal, this court reversed the trial court's dismissal of the petition and remanded the case for appointment of counsel. *Mario Pendergrass v. State*, No. M2003-02144-CCA-R3-PC, 2005 WL 176494, at \*3 (Tenn. Crim. App. Jan. 25, 2005). Petitioner, with the assistance of counsel, filed an amended petition. After a full hearing, the post-conviction court denied post-conviction relief. This appeal follows.
.

## III. Facts from the Post-Conviction Hearing

The Davidson County Criminal Court held an evidentiary hearing on September 27, 2010. The hearing began with petitioner's motion for the judge to recuse himself on the basis that petitioner believed him to be biased because the judge heard the facts established at trial and conducted the sentencing hearing. Upon denying petitioner's motion to recuse, the court heard the following testimony of trial counsel and petitioner:

Attorney One,[2] now a professor of law at the New England School of Law in Boston, Massachusetts, testified that he was employed by the Davidson County Public Defender's Office from May, 1990, until May, 1996. During that time, Attorney One's law practice was exclusively criminal in nature. At the time Attorney One began representing petitioner, he

---

[2] At trial, attorneys from the Davidson County District Public Defender's Office represented petitioner. To avoid confusion, this court will refer to petitioner's original lead attorney as "Attorney One." "Attorney Two" shall refer to the attorney who, although Attorney One's supervisor, assisted and supported Attorney One in representing petitioner before assuming a more central role in the case due to Attorney One's relocation to Massachusetts. Attorney Three shall refer to an assistant district public defender who assisted Attorneys One and Two. At the time of the hearing on the post-conviction petition, Attorney Two was deceased.

had been practicing law for approximately three years. He was assigned as principal counsel, but had support from a senior assistant district public defender (hereinafter "Attorney Two") and various staff members. Attorney One represented petitioner through his trial in 1998, but when he physically left the public defender's office in 1996, Attorney Two assumed the role of lead counsel.

During 1994 or 1995, the State notified Attorney One that it would seek the death penalty in petitioner's case. At that time, the supreme court rule regarding qualification of capital case lawyers did not exist; however, Attorney One had tried approximately fifteen to twenty murder cases and had been involved in an equal amount that were resolved without a trial. Attorney One's particular position of Senior Assistant Public Defender/Criminal Court Floating Lawyer involved handling cases in different divisions that were either particularly long or relatively complex.

During his representation of petitioner, Attorney One met with petitioner more than one hundred times, in addition to telephone calls and letters. After petitioner was moved to Riverbend Correctional Facility, Attorneys One and Two met with petitioner primarily on the weekends, at least once per month. After Attorney One left the district public defender's office, petitioner continued to call him collect, and Attorney One traveled back to attend pre-trial hearings and to meet with petitioner.

Petitioner's attorneys sought the assistance of mental health experts in preparing for the trial and the penalty phase of the case. The State withdrew its notice of intent to seek the death penalty in July 1998, but until that time the defense attorneys prepared for the case as though it would be a death penalty case. The defense sought funds ex parte for mental health experts and attempted to develop mental health evidence. Attorney One recalled that petitioner was evaluated by Dr. Tom Neilson. Dr. Michael Batari in Georgia reviewed petitioner's records, and Dr. Harold Burstajyn, a psychiatrist at Harvard Medical School, assisted in examining and developing issues. Vanderbilt Hospital conducted a positron emission tomography ("PET") scan to look for disease of or injury to the brain. Although Dr. Neilson diagnosed petitioner as having Intermittent Explosive Disorder in 1995, the doctor did not believe that the diagnosed disorder would have supported an insanity defense. The doctor's concern with petitioner's disorder was that it would cause him to decompensate under the pressures of trial and would thus render him incompetent to stand trial either immediately before or during the trial.

Attorney One further testified that in July of 1998, petitioner's attorneys reached an agreement with State for the State to withdraw its notice of intent to seek the death penalty in exchange for petitioner's waiver of his right to a jury trial. Attorney One believed that to be a positive outcome, as it removed the death penalty from consideration. The result was

also beneficial in that petitioner would not be subject to the stress of a jury trial. At the time petitioner executed the waiver of his right to a jury trial, Attorney One believed that he was competent.

However, a short time after petitioner executed the waiver, his attorneys grew concerned about his competence. Consistent with the information counsel received from the various medical professionals, petitioner developed fears of being manipulated and had difficulty trusting people. In Attorney One's opinion, it was not unusual to have clients who were distrustful of the criminal justice system in general and the judges and attorneys specifically. Petitioner also became delusional. At one point, petitioner indicated that he no longer wanted the district public defender's office to represent him. Attorney One and members of his staff discussed the issue with petitioner. Each attorney met individually with petitioner and collectively they forwarded their observations via e-mail to Dr. Burstajyn at Harvard. Dr. Burstajyn opined that petitioner's reaction in becoming mildly delusional was not an uncommon response to a sudden removal of extreme pressure, in this case, removal of the possibility of the death penalty. Dr. Burstajyn did not believe that petitioner's mental condition raised a question about competence. Petitioner became more calm after a few days.

During this delusional period, petitioner reportedly suffered from a delusion called the "Masonic Conspiracy." Pursuant to this conspiracy theory, petitioner asserted to counsel's staff that he believed himself to be Jesus Christ, the Son of God. Attorney One and his staff communicated about whether petitioner would be competent enough to decide whether to testify and to actually testify if he so chose. Attorney One's view of "competency" embraced a range of factors, including being able to communicate effectively with counsel, to testify coherently if he chose to do so, to understand and appreciate the significance of the proceedings, and to make rational judgments about decisions during the course of the proceedings. Attorney One and his staff agreed that the touchstone for going forward was whether petitioner could assist in his own defense. Attorney One noted that, at that point in the process, they did not require much assistance from petitioner. Attorney One and his team did not seek further evaluation of petitioner because the recent delusions would have no affect on petitioner's sanity at the time of the offense and further e-mail correspondence with Dr. Burstajyn at Harvard yielded the professional opinion that his delusion was consistent with the sudden removal of extreme stress. Dr. Burstajyn did not believe that the delusions gave rise to a competency issue. Had Dr. Burstajyn's conclusions indicated otherwise, Attorney One would have sought an additional evaluation. Petitioner's deterioration and delusions about the Masonic Conspiracy were very intense immediately following execution of the waiver of his right to trial by jury. Attorney One did not observe the symptoms a few weeks later as they began to prepare for trial. As time for trial neared, petitioner no longer expressed a desire for his attorneys to withdraw from the case. Nothing in petitioner's

behavior at trial led trial counsel to have concerns regarding petitioner's competence or mental state.

In addition to developing mental health evidence, Attorney One and his staff thoroughly investigated the events of petitioner's life. He learned of petitioner's history in foster care, his juvenile mental health history, and his history of inpatient and outpatient hospitalization for mental health issues. Attorney One studied petitioner's educational history, including early intelligence testing. He maintained a trial notebook with tabbed sections for each prospective guilt phase witness. The sections contained statements received from the State and interviews Attorney One or his staff conducted.

During pre-trial preparations, petitioner participated in his defense. During the course of the proceedings, the attorney-client relationship was effective. Attorney One attributed the occasional conflict as being consistent with petitioner's mental state and the pressures of being held in a maximum security facility awaiting trial and previously facing the death penalty. Attorney One did not recall whether he litigated petitioner's alleged illegal arrest and seizure as a pre-trial motion. If he did not, he did not see a basis for such a challenge. Law enforcement did not seize any incriminating physical evidence as a result of petitioner's arrest. The most incriminating evidence against petitioner were his statements. Attorney One fully litigated the admissibility of petitioner's statements by pre-trial motion in the trial court and by interlocutory appeal to this court. He also litigated a *Brady* issue in an attempt to discover the exact terms of the State's agreement with petitioner's co-defendant.

In preparing for trial, Attorney One interviewed Tellas Ensley, a witness for the State. Attorney One conducted the interview and two other staff members were present. The interview was tape-recorded and Attorney One secured a transcript of the interview. The State offered the witness during its case-in-chief. On cross-examination, the witness claimed that he was not the person on the tape. Attorney One attempted to impeach the witness's testimony with the tape; however, because no witnesses to the interview were available to authenticate the recording, the court disallowed introduction of the tape. The court permitted Attorney One to use the transcript to impeach the witness.

Attorney One advised petitioner of his right to testify on his own behalf. Attorney One and his staff spent considerable time with petitioner to develop his testimony. Attorney One felt that petitioner was prepared if he had chosen to exercise his right to testify. Petitioner made the informed decision not to testify. Attorney One did not recall whether he advised petitioner not to testify, but was certain that petitioner's competency was not a factor in making the decision.

Petitioner testified at the evidentiary hearing that he had regular contact with trial counsel and members of the staff. He recalled seeing a doctor early in the legal process and receiving a prescription for Depakote. Petitioner stopped taking the medication a month later because he did not like the side effects. The medication made petitioner experience "highs and lows." Petitioner maintained that no one informed him that he had been diagnosed with Intermittent Explosive Disorder.

Petitioner did not trust Attorney Two. He would refuse visits with Attorney Two because of his mistrust. Petitioner's mistrust was based on Attorney Two allegedly sending other attorneys to meet with petitioner. One such attorney allegedly gave petitioner a credit card from Attorney Two and told him to pick out anything he wanted from Eastbay. In exchange, the attorney asked petitioner to sign a waiver stating that he would accept a life sentence. The attorney supposedly told petitioner that Attorney Two sent him to speak with petitioner because petitioner would identify better with said attorney because they were both African-American. After that development, petitioner declined visits with Attorney Two until petitioner met one of the female attorneys (hereinafter "Attorney Three") from the district public defender's office.

Petitioner was not concerned that he faced a possible death sentence. He believed his attorneys were more concerned about it than he was, perhaps because they would feel guilty if he were sentenced to death. For that reason, petitioner felt that his attorneys were more inclined to encourage him to accept an agreement rather than to fight for his defense. During his first meeting with Attorney One, petitioner stated that he would not accept a plea and that he wanted to "fight adamantly" to defend himself.

When Attorney Two presented petitioner with the waiver of his right to a jury trial, petitioner recalled that Attorney Two told him that a judge would look at the case differently than a jury would. Petitioner stated he just wanted to proceed to trial. Petitioner also stated he wanted to take the stand and ask questions of the judge. Although Attorney Two allegedly responded that petitioner would be able to do so, he never had the opportunity.

Petitioner further testified that at the time he executed the waiver, he told both of his attorneys that he wanted to take the stand and question the judge about the waiver. He wanted to ask whether the judge would consider the polygraph that petitioner completed. Petitioner knew that the judge would have access to the entire police report and wanted to ask the judge if, after reading the contents, he could remain fair and neutral. Petitioner wanted to confirm that he would be able to testify and speak on his own behalf, as he had been reprimanded for speaking out in court on prior occasions. Petitioner also sought clarification from the judge about whether he could be convicted of both first-degree murder and felony murder. He further wanted to confirm the ranges of punishment for the offenses

-12-

with the judge. Petitioner did not wish to sign the waiver until he questioned the judge. Attorney Two informed petitioner that there was a deadline by which he must be sign the waiver and return it to his attorneys. Petitioner was adamant that until he took the stand and questioned the judge, he did not want the waiver submitted. His position was that his signing the waiver did not authorize his attorneys to submit it. He believed that his agreement with his attorneys was that they would not move forward with submitting the waiver until he had the opportunity to question the judge and that if he was not permitted to take the stand and question the judge about the waiver, he would be able to revoke it. His attorneys later informed him that he would not be allowed to question the judge. Petitioner stated at the evidentiary hearing that he would rather have faced the death penalty than for his life to be worthless.

Petitioner testified he was informed that he had a right to testify on his own behalf. He told Attorney Two that he wanted to testify, and he prepared for his testimony. Attorneys Two and Three and another individual from the district public defender's office met with petitioner to prepare his testimony. During the trial, petitioner reminded Attorney Three that the defense team had told him that he could take the stand. She responded by telling him to calm down and be patient. From that point forward, petitioner did not trust his attorneys. He felt that he was being coerced and that he had no input into the direction the attorneys were taking the case. If petitioner had testified, he would have maintained his innocence to the court. He also would have allegedly rebutted some of the testimony of the State's witnesses.

At the post-conviction hearing, petitioner stated that one of his attorneys should have interviewed a juvenile detention officer regarding statements made by his co-defendant indicating that the co-defendant had committed the murders. He was unaware of whether his attorneys discovered the officer's identity and whether anyone interviewed the officer. One of his attorneys told petitioner that the testimony of another witness, the co-defendant's brother, would have been beneficial to highlight the discrepancy in Steve Tellas's[3] testimony. Petitioner felt that someone should have interviewed his co-defendant's aunt and her husband, as his co-defendant had asserted that the murder weapon belonged to the husband of the co-defendant's aunt. The testimony would have refuted the State's contention that the gun belonged to petitioner. Petitioner had not spoken with any of the witnesses and did not know what their testimony would have been. The only information he had regarding their potential testimony came from his attorneys.

---

[3] Attorney One testified about the witness Tellas Ensley. Presumably, Tellas Ensley and Steve Tellas are the same individual in light of the context.

Petitioner believed his attorneys erred in failing to challenge the testimony of a witness. The witness testified that petitioner hid the guns after the murders. The witness then testified that he showed the police where the guns were hidden. Petitioner maintains that counsel did not challenge the contradictory statements made by the witness. Petitioner observed that his attorneys became overly relaxed after the death penalty was removed from consideration and asserted that they should have advanced a more effective defense.

Petitioner complains that his attorneys never informed him of the maximum and minimum punishments for the offenses. Once the death penalty was no longer a consideration, they did not inform petitioner of the sentencing possibilities.

The post-conviction court issued a thorough order denying post-conviction relief on December 7, 2010.

## IV. Analysis

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane*, 316 S.W.3d at 562 (quoting *Grindstaff*, 297 S.W.3d at 216).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Questions regarding the credibility of witnesses are matters entrusted to the trial judge as the trier of fact. *Dellinger*, 279 S.W.3d at 292 (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact carry the weight of a jury verdict and are conclusive on appeal unless the preponderance of the evidence is otherwise. *Rigger v. State*, 341 S.W.3d 299, 307 (Tenn. Crim. App. 2010) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). However, conclusions of law receive no presumption of correctness on appeal. *Rigger*, 341 S.W.3d at 307 (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Dellinger*, 279 S.W.3d at 294 (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975)). The constitutional right to counsel attaches when adversarial judicial proceedings are initiated against the defendant. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). "Initiation" is construed as issuance of an arrest warrant, the time of the preliminary hearing in cases where an arrest warrant is not first issued, or by indictment or presentment issued by a grand jury. *Id.* at 286.

To prevail on his claim of ineffective assistance of counsel, petitioner must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Finch*, 226 S.W.3d at 315; *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Baxter*, 523 S.W.2d at 936). To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Strickland*, 466 U.S. at 688). As our supreme court has previously held:

> '[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.'

*Baxter*, 523 S.W.2d at 934-35 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689); s*ee Finch*, 226 S.W.3d at 316.

To establish that petitioner suffered prejudice as a result of counsel's deficient performance, petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch*, 226 S.W.3d at 316 (quoting *Vaughn*, 202 S.W.3d at 116). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 694); s*ee Finch*, 226 S.W.3d at 316. As such, petitioner must establish that his

attorney's deficient performance was of such magnitude that he was deprived of a fair trial and the reliability of the outcome was called into question. *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694; *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Petitioner must establish both deficient performance and prejudice therefrom to be entitled to post-conviction relief. *Vaughn*, 202 S.W.3d at 116*; Howell*, 185 S.W.3d at 326. It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

In his petition for relief, petitioner first asserts that he was incompetent to stand trial and incompetent to waive his right to a trial by jury. He claims that his attorneys were ineffective in failing to obtain an additional mental health evaluation, in failing to file a motion to have him declared incompetent, and in failing to move that the jury trial waiver be set aside on this basis. Because petitioner's claim stems from his competency at or around the time he executed the waiver of a jury trial, evaluation of this issue necessarily involves an analysis of his attorneys' actions in preparing for trial (pre-waiver) and performance after he signed the waiver (post-waiver).

As part of his trial preparation, Attorney One sought assistance in developing mental health evidence through four separate sources. He secured a personal mental health evaluation for petitioner. Attorney One retained two additional experts to review petitioner's records and the mental health evaluation. One of the experts consulted with counsel regularly regarding petitioner's behavior. Attorney One also obtained a "PET" scan for petitioner at Vanderbilt Hospital. The testimony developed at the evidentiary hearing established that, through the mental health evaluations of petitioner, Attorney One learned that petitioner suffered from Intermittent Explosive Disorder. He testified that while none of the evaluations supported an insanity defense, the evidence would have been essential during the penalty phase of the capital trial. Petitioner failed to present evidence to the contrary at the evidentiary hearing.

The post-conviction court found that Attorney One's representation was not deficient in this respect. We agree. Petitioner failed to present clear and convincing evidence of his pre-waiver insanity or incompetence, and after de novo review of the trial court's conclusion of law, we credit the trial court's finding that counsel performed effectively. Because petitioner has failed to establish the first prong of an ineffective assistance of counsel claim with respect to this issue, that of deficient performance, we are not compelled to review whether petitioner suffered prejudice.

Petitioner further avers that he was incompetent to execute the waiver of his right to trial by jury. The post-conviction court heard testimony that, in the days following

petitioner's signing of the waiver, he experienced mildly delusional behaviors such as a fear of being manipulated and general mistrust of his attorneys and the criminal justice system. Further evidence demonstrated that petitioner experienced delusional behavior in the period immediately following his execution of the waiver of his right to a jury trial. Attorney One testified he was aware of the delusions and was concerned about petitioner's competence to go forward.

Attorney One contacted his retained expert, a psychiatrist at Harvard University, and described petitioner's delusions and odd behavior. The doctor explained that petitioner's behavior was consistent with the sudden removal of a stressor, i.e., an impending capital murder trial that could result in a death sentence. The doctor did not believe that the delusions gave rise to a competency issue. Attorney One also testified that petitioner experienced conspiracy theories and more elaborate delusions, in which he believed himself to be Jesus Christ. Petitioner's behavior led Attorney One to again consult with the Harvard psychiatrist, who stated that the manner of petitioner's behavior was a very common reaction among neuropsychiatrically vulnerable individuals upon the removal of extreme stress and did not rise to the level of incompetence. Petitioner's psychiatric symptoms dissipated after a few days, after which petitioner did not suffer from further delusions. Attorney One stated that petitioner displayed no signs of paranoia or delusions during the bench trial.

Relying on the expert's opinion, Attorney One did not seek a post-waiver mental health evaluation. A defense attorney "must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. Attorney One thoroughly investigated the implications of petitioner's delusional behavior as it pertained to a possible mental health issue. When petitioner became delusional, Attorney One sought the advice of their expert, who did not recommend further testing. We decline to hold counsel ineffective for following the advice of their expert. *See Dennis Wade Suttles v. State*, No. E2008-02146-CCA-R3-PD, 2011 WL 1642640, at *26 (Tenn. Crim. App. April 29, 2011) (holding that when an expert advises against further testing, the court will not deem counsel ineffective for failing to pursue the matter further), *perm. app. denied* (Tenn. Nov. 16, 2011).

Although petitioner testified on his own behalf at the evidentiary hearing, he failed to present medical or mental health evidence to support the proposition that petitioner was incompetent either to stand trial or to waive his right to a trial by jury. In the absence of such evidence, we hold that the petitioner has not established by clear and convincing evidence that his trial attorneys were ineffective in failing to obtain a second, post-waiver, mental health evaluation. We decline to review this issue for prejudice to petitioner, having found no deficiencies in his trial counsels' actions in this regard.

Couched in different terms, petitioner again argues that his waiver of his right to a jury trial was involuntary, not due to incompetence, but because the trial court denied him due process in failing to determine that the waiver was voluntary.

Tennessee Code Annotated section 40-30-106(h) provides:

A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

*See Thomas v. State,* 298 S.W.3d 610, 614 (Tenn. Crim. App. 2009).

Petitioner litigated this claim in his motion for new trial, and the trial court found that petitioner voluntarily waived his right to a trial by jury. On direct appeal, this court reviewed petitioner's claim, again finding petitioner's waiver to be valid. *Mario Pendergrass*, 2002 WL 517133, at *17. This issue has clearly been determined by two courts of competent jurisdiction after a full and fair hearing. As such, this issue is foreclosed as being previously determined.

Petitioner next advances the argument that his attorneys were ineffective in denying him the right to testify on his own behalf. Attorney One and petitioner offered conflicting testimony on the issue. Attorney One testified that he advised petitioner of his right to testify on his own behalf, and he and members of the defense team spent time with petitioner developing his testimony, should he have decided to testify at trial. Attorney One stated that petitioner made an informed decision not to testify. Petitioner stated that he persisted in his request to his attorneys to testify at trial, and at no time did he choose to waive that right. He testified that at trial he reminded his attorneys of his desire to testify but they would not permit him to do so. Petitioner made an offer of proof at the evidentiary hearing regarding what his trial testimony would have been if he had been permitted to testify at trial. Petitioner would have asserted his innocence and would have contradicted the testimony of some of the State's witnesses.

The post-conviction court heard the conflicting testimony and ruled, "The petitioner has three prior felony convictions . . . . [Attorney One], on the other hand, is a well-respected attorney . . . . Thus, the court is inclined to resolve testimonial conflicts in favor of counsel." The post-conviction court made a determination of credibility, which we will not disturb on appeal. *Dellinger*, 279 S.W.3d at 282. The post-conviction court resolved the conflicts in the testimony in favor of trial counsel. "[T]his court gives great weight to the determinations

made by the trial court concerning the credibility of the witnesses; and this court will not interfere with the trial court's findings of fact in this regard unless the evidence contained in the record clearly preponderates against these findings." *State v. Parker*, 932 S.W.2d 935, 956 (Tenn. Crim. App. 1996). The evidence does not preponderate against the post-conviction court's findings of fact regarding the credibility of witnesses. Accordingly, we find no deficiencies in his attorneys' performance in this regard. We need not reach the question of whether petitioner suffered prejudice as a result.

## V. Conclusion

After thorough review of the record, we discern no deficiencies in trial counsels' representation of petitioner. We are precluded from reviewing petitioner's claim that his waiver of his right to a trial by jury was involuntary, inasmuch as the issue has been previously determined. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE